The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Craig H.D. Armon presiding. Morning, counsel. We'll call case number 4-22-0960 Yosef Fredman v. OSF Healthcare Systems et al. Good counsel for the appellant, please state your name for the record. Jansen. Your audio is very low, Ms. Jansen. I could hardly hear you. I couldn't either. I'm sorry. Good counsel for the appellee, please state your name for the record. Yes, my name is Lynn Dow. Thank you. Is that any better? It is, but we can't see you. Okay, we'll be back over after hearing you. The audio is very low. I think the problem has to do with your standing, perhaps, at a podium as opposed to close to your microphone. How about now? Can you hear me now? A little better. A little better? Not much. Okay. If I come down here, can you hear me? Yes.  That's significantly better. Okay. Is that working? It is. Thank you. Yeah, you're welcome. I'm sorry about the technical difficulties. That's all right. Ms. Jansen, you may proceed. So, there are three issues really at play in this appeal. Whether or not the plaintiff satisfied the outcome determinative test, whether or not fraudulent concealment applies to told statute of limitations, and then whether or not the plaintiff demonstrated due diligence in pursuing the section 1401 petition. I'd like to start out with the outcome determinative test because, quite candidly, I think it's simply the easiest of the issues at play. What we're dealing with here is a failure to amend a privilege law. There was medical data entered into a quality and safety database at the hospital. Ms. Patton and Ms. Patel have both candidly conceded that that privilege law absolutely should have been amended, and they have expressed their remorse for that failure. Ms. Jansen, I hate to interrupt you so early in your argument, but this is something that I just would like clarification on because I think it might have relevance, then, in my own thinking as to all of the issues that are being discussed here. It's just the factual matter here, and it relates to the… Do you pronounce it Peminec? That's how I pronounce it. I'm not sure if it's correct or not, but Peminec is how I've been saying it. The Peminec data, as it's referred to in the briefs, in the Simmons case, which is a separate case, the Peminec data consisted of three pages. Is that right? When the data was printed out from the system, yeah, the complete amount of data that was stored, I assume it's the complete amount that was stored in the Peminec system for that case, came out to three pages. Yeah, it's awkward trying to refer to data, but I'm sorry, go on. Okay. In this case, in terms of what was provided to the trial court for in-camera review, did the Peminec data consist of three pages? That is correct. Okay. And what was initially provided in the privilege log was a one-page Peminec report, right? Oh, the privilege log just referred to Peminec report. It didn't specify a number of pages. What was produced at the hearing on the motion to compel was the one-page incident report. Okay. Thank you. So what we have is then three pages of Peminec data was provided to the trial court later for in-camera review. And what was initially provided to plaintiff following the motion to compel was one page of Peminec data, correct? That is correct. Okay. How did what seems to have been three pages worth of data get altered, revised, however you want to term it, into one page of Peminec data in the first place? What do we know about that? So we know that all of this data is entered into a computer database. And then so you can generate paper copies of that information by selecting, you know, print this field, this field, which entries you want printed. So the one that was produced was selecting the fields that pertain to the incident report. The one that Judge Reisinger reviewed in camera included additional data fields. So it wasn't, nothing was altered. It was just printed out in two different ways. And you can compare that one page that is, that was produced to the plaintiff with the data that was reviewed by Judge Reisinger and see that all of the data produced to plaintiff is included without alteration in the data that was provided to Judge Reisinger. Judge Reisinger in camera simply had more data to review. Well, so put another way, there was data excluded in the initial production, the initial Peminec data that was consisted of one page. That didn't contain data that was contained in the subsequent three-page Peminec data that was given to Judge Reisinger for in-camera review. Is that fair? Yeah, if I followed that correctly, yes, that is correct. In other words, it wasn't just minimizing a three-page document to be one page. There was data that was excluded from the originally produced document. So who made that determination? Who called the information out in that first produced document? Was that OSF or was that OSF's attorney? I believe that was the attorney's based on the fact that initially they felt that the entire compilation of data was protected by the Medical Studies Act. Then the plaintiff's counsel, Mr. LaFonte, had sent some case law, they reviewed it, they reviewed the data, discussed it with the client, determined that the portion that was akin to an incident report probably wouldn't be protected by the Medical Studies Act. So that's what they then pulled out and produced at the motion to compel. And based on the title and the framing of the motion, it appeared that that was what plaintiff's counsel was looking for. Well, a follow-up question is, did they know that there was additional data when the first disclosure was made? Yes, they did. The record reflects that? I believe so, yes. Well, yes. No, I believe Natasha acknowledged that she had all of the data, Ms. Patel, prior to her initial disclosure. And I interrupted you, you may proceed, but when you get to the portion of your argument that deals with intentional concealment, my thought here is that there are basically two things that are to be reviewed. One is just simply whether or not the privilege log should have been amended, but was not. Was that unintentional or not? But also, the altering, or take whatever term you'd like to use to describe what was done with three pages worth of PEMINIC data to come up with one page of PEMINIC data, the revisions. The revisions constitute an additional act, and whether or not that constitutes an intentional act when we're talking about the withholding of discovered materials. So you may proceed. Thank you. Well, unfortunately, Ms. Jansen, I have a question that's in conjunction with what Justice Harris has asked you, because I want to see if my understanding of this is accurate or not. As I understood it, when they received the request and they were going to respond to that request, whatever they do on the computer, they pull up what essentially is this incident report. In order to get the other material, they would have had to gone into other fields, search fields, to find that material and then pull that up as well. That is my understanding of how it works, yes. They were aware those fields existed, but just didn't include that information in response to the request. Well, they believe those other fields were fields that are protected under the Medical Studies Act and that they would therefore be prohibited from producing them. Because Ms. Patel, initially in the privilege log, simply referred broadly to all of this data as heminec report, it wasn't clear that there were different fields. So in terms of what she disclosed to plaintiff's counsel, it wasn't clear that there was an incident report and then there was additional quality and safety materials in the database. That's what they should have once they kind of started to figure this out, should have gone back and amended the privilege log. But this was the first case that Ms. Patel and Ms. Patton had worked on that involved this heminec database. They were still kind of trying to figure out how it worked as well. And if I understand correctly, this whole heminec process, is this like a third party vendor that is responsible for maintaining this information? Or is this an in-house computer system? I'm not entirely clear. My understanding was that it was like a software product that was used to make heminec. But yeah, as you've probably already observed, I am not the technological genius in the room. Neither am I, or my questions probably would have been better. No, excellent questions. The point I think I'm trying to get to, though, is that they, when they pulled up the information and find that there's this other material, did they then identify through the privilege log that they're disclosing X, but there is 1, 2, and 3, for lack of better designation, that remain privileged, and here's why. That they did not do, and that conceitedly was a mistake on their part. I think you can go through both Ms. Patel and Ms. Patton's testimony and see. Ms. Patel, at the time that they were sorting this out, was in the middle of a two-week trial, trying to figure it out, trying to respond to a series of different communications from plaintiff's counsel about this discovery. When it got to the motion to compel hearing, she had, along with Ms. Patton, determined that they should produce the portion that was akin to an incident report, the incident data. And then Ms. Patton was going to amend the privilege log. That was Ms. Patton's understanding. I'm sorry, that was Ms. Patel's understanding. Ms. Patton intended to do it, meant to do it, and for a lot of personal reasons that are detailed on the record, and I want to be gentle about not going too much into her private matters, but there were things going on in her world that she wasn't at her best, thought she had amended the privilege logs, never did. Didn't realize it until after plaintiff had already voluntarily dismissed the case. Judge Sienoff, I think you've been patiently waiting to ask something. Well, that's all right. Certainly, my colleagues have asked important questions that we need to find answers to. But I wanted to return for a minute then to the outcome determinative test and ask you, you do argue that Judge Reisinger applied an erroneous legal standard by finding that the unawareness, I think that's what he had said, of the data was part of the calculation of plaintiff voluntarily dismissing the case. But you do not cite any case applying this outcome determinative test in the context of a petition to vacate a court, applied an erroneous legal standard here. And because for such a long time, the rule was, and the third district in the previous appeal held that it doesn't apply here. And so we're, well, the case bound by that. But the rule has long been that a voluntary dismissal cannot be vacated after the fact. And that's been abrogated as to within 30 days, whether or not 1401, third district said that you can still, you can vacate it under 1401. And we're stuck with that for now. But there's very little case law as a result pertaining to motions to vacate a voluntary dismissal because, you know, it's voluntary, you chose to do it. So what we've had to rely on is the wording of the outcome determinative test as enunciated by the Illinois Supreme Court and Lubbers, that the additional wrongfully withheld material would have prevented the entry of judgment. Excuse me. And so by biological extension in this case, in order for this additional information to have prevented the entry of the voluntary dismissal judgment, it would have had to, had plaintiff's counsel received the additional information, it would have changed the decision to voluntarily dismiss the case. And that's one of the chief problems with their evidence with respect to the outcome determinative test is for one, we don't know why plaintiff chose to voluntarily dismiss the case in the first place. We plaintiff's counsel had represented at the initial hearing in front of Judge Hoos that it was in part because they didn't think they could prove their case. No evidence was presented at the evidentiary hearing in front of Judge Reisinger. There's never been any evidence of Mr. Fredman himself, the actual plaintiff, why he dismissed it initially, whether he would have done something differently. Had he known about the existence of the additional data? We just don't know. But the other part of- He never saw this additional data, so he really can't be faulted, can he, for failing to testify with any more specificity. Well, he had the knowledge that additional information exists as to which the defendants are claiming the protection of the Medical Studies Act, which is all that plaintiff's motion depends on. And no determination has ever been made that this is not protected by the Medical Studies Act. We noted in our brief that there have been subsequent determinations that it is protected, but for purposes of this appeal, plaintiff chose not to pursue a determination as to whether or not that additional withheld data is in fact protected. And if it is protected, it would have been a class-A misdemeanor for the cannot be waived. So that, you know, yes, it should have been mentioned on the privilege log, absolutely. But it's still entitled to the protection under the Medical Studies Act. That's not a protection. It's often loosely referred to as a privilege, but it's not really a privilege. It's a prohibition. It's a statutory prohibition against the disclosure of this particular type of information. Defendants were not permitted to disclose it. And if the Medical Studies Act applies, as we have contended, and as Judge Ayer-Ruley ultimately found, then plaintiff would never have received the additional data. So the fact that we failed to disclose its existence didn't make a difference because had Ms. Patel or had Ms. Patton amended the privilege log and noted this additional data, they would have been asserted the Medical Studies Act protection. Plaintiff presumably or potentially would have challenged that. And if the court found that it is protected by the Medical Studies Act and this data cannot be produced to the plaintiff, that's the end of the story. Then plaintiff has the exact same information they had when they chose to voluntarily dismiss the case. Counsel, you only have two minutes left. I think I'd like to turn to the fraudulent concealment issue Justice Harris mentioned at the beginning. If we agree with your argument that Judge Reisinger incorrectly determined that unintentional discovery violations can amount to concealment, isn't Judge Ayer-Ruley's finding regarding lack of intent fatal to plaintiff's request for 214-01 relief? In other words, would there be any reason for us to remand the case to Judge Ayer-Ruley to make this finding a second time? I don't believe so, Your Honor, no. And in connection with plaintiff's request for sanctions that defendants and their counsel did not commit an intentional discovery violation, right? That is correct. That is correct. Yes. And so the standard is intentional fraudulent conduct. I think it's clear that Judge Reisinger concluded that it didn't have to be intentional. We've cited Herrera versus Herrera in our opening brief. In addition, Cavett versus Rappel and Inri Himmel in the reply. All cases holding that to prove fraudulent concealment, you need to show by clear and convincing evidence that the other party intentionally misstated or concealed a material fact. There's no evidence here that they intentionally misstated the facts. But as Judge Ayer-Ruley has found, as Judge Hoos found at the initial evidentiary hearing, and I see my time is up. Go ahead and finish your thought. Okay. And as Judge Reisinger also at the conclusion of his phase of the proceedings also said, you know, I think Rhonda Ferrero Patton intended to amend the privilege law and I think she just forgot. So now that's three judges who've all found that a regrettable mistake. Absolutely. What a mistake. Justice B. Armand, may I ask the panel's indulgence to ask another question? Right ahead. Okay. Thank you. Just in terms of the intentional conduct, how are we to view OSF's counsel's conduct in knowingly providing less of the PEMINEC data to plaintiff's attorney than what existed? You've addressed the OSF's counsel's failure to amend the privilege law, but was it also for part of the fraudulent concealment analysis to determine whether the initial withholding of the, I'm going to call it two pages worth of the PEMINEC data, whether that should have been considered as well in terms of intentional conduct? So what I would suggest is, because it does, it gets confusing when we think of this data as, you know, a three-page document, when it's really printout of electronically stored information that, you know, depending on which fields you select, could be one page, could be two pages, could be three pages. I would think of it in terms of like, you know, old school, the Manila folder with a bunch of documents stuck inside. And say there are three pages worth of documents or three different documents in that Manila folder. What Natasha Patel did is pick the page out of that folder and produced it, retained the other two documents, which she and her supervising attorney had concluded are protected under the Medical Studies Act and that they were prohibited from producing. So it's that part that I'm, and thank you for that analogy. So the intentional withholding of those two pages from the Manila folder, should that be considered by court in determining fraudulent concealment? Are you saying it's only the failure to amend the privilege log that's part of that inquiry? In this case, it is the failure to amend the privilege log, and I'll explain why. For the fraudulent concealment, it's not just that you intentionally withheld information, it's that you intentionally withheld information that you had a the defendant's attorneys from providing the information. Then they could not have intentionally withheld material that they had a duty to provide. They didn't have a duty to provide it. In fact, they had a duty to not provide it, to retain it and to maintain the protections. Okay, thank you. Thank you. All right. Thank you, Ms. Jansen. You'll have an opportunity on rebuttal. Ms. Dowd. Thank you, your honors. Good morning. May it please the court. Based on the argument just presented, I'd like to get right to the essential issues and clarify, first of all, the facts, the evidence, the legal rulings, and the law. And it sounds like a lot, but I'm going to try to do this as succinctly as I can. First and foremost, there has never been a ruling that the Medical Studies Act applies to any of the subsequent to this proceeding. There's a sanction proceeding, and actually that's up on appeal before your honors. There's comments by the court, but that issue has never been briefed by the parties. And I'm prepared to address it if your honors would like, because the law states that the documents and the information at issue must have been initiated and at the behest of a peer review committee to even be considered as being privileged under the act. Here we have testimony from the defense attorneys that it was not. There was never a peer review committee formed with respect to the information at issue in this case. So I bring that to the court's attention. It's very important, and we're prepared to brief that when we go back downstairs, assuming an affirmance, of course. But secondly, at issue is not just a mere failure to amend a privilege log. At issue is a whole host of discovery violations that undermine the entire fairness of the trial below with respect to the Fredman family and their right to have a day in court. And it is as follows. The defendants never answered fully the written interrogatories and the request to produce for information, information about this incident. What information is out there? As we know, the only thing they ultimately produced was some one-page report we're all calling the PMINIC report. But they never disclosed that there's an entire database pertaining to this incident. They never disclosed the persons involved in preparing this information so that we could explore that. You know, putting aside the Medical Studies Act issue, we had a right to pursue discovery, to find out who's involved, what was said. And as we know, under the Medical Studies Act case law coming out of our reviewing courts, the findings and recommendations thereafter are not privileged. We had a right to find out all of this information. This is no small matter, Your Honors, because as Mr. LaFonte testified at trial, this affected his entire preparation of his case, his strategy, how he pursued discovery, how he deposed witnesses. It affected the information that the plaintiff's experts were given. And as a footnote, Mr. LaFonte testified that the experts were not the reason for the fraudulent concealment as an important issue in this case. And I have a couple questions with respect to that issue. First of all, in Herrera v. Herrera, the First District appellate case, the court there said in order to prove fraudulent concealment in a 214-01 petition, the petitioner has to prove, and I'm paraphrasing, by clear and convincing evidence that the other or she had a duty to disclose and that the petitioner detrimentally relied on that statement or conduct. What is your basis for asking us to reject this well-settled law in this case based on the facts we have here? I'm not asking you to reject that, Your Honor, and I'd like to answer that in a couple of ways. First of all, no disrespect to the Herrera appellate court, our Supreme Court in Ostendorf and Lubbers has addressed this issue, and I think that's where the court's analysis should commence. Because in Ostendorf, the Supreme Court made very clear and answered this question as a matter of law. We don't have to debate the issue. The Supreme Court held that for purposes of, number one, tolling the statute of limitations, less than full candid disclosure in discovery constitutes fraudulent concealment. Then the Supreme Court went on in Lubbers to state that when evaluating the evidence to determine if there was fraudulent concealment, when the court sitting as the finder of fact and reviewing the witness's credibility has analyzed all of that, the court can reasonably infer based on the evidence and what was presented that the outcome would have been different. But now, with respect to whether we actually proved it by clear and convincing evidence, I submit we've even met that standard. Let me go back before, hold on to that thought for a second, please. If we go back to Ostendorf though, didn't the language there suggest that the court was discussing intentional discovery violations, not something less than that? I think certainly the court was, but in reading the entire opinion and the subsequent opinions out of the court and the various reviewing court decisions we've discussed, it doesn't matter when it comes to a 1401. Fraudulent concealment in the context of a 1401 action is not the same as looking at fraudulent concealment in other areas of the law, other substantive causes of action. With 1401 being mindful that it's an equitable remedy where the court's role is to evaluate whether there has been substantial injustice, which here there has, the court can relax the standards. And the bottom line is when the plaintiff has exercised diligence in submitting discovery, the plaintiff here had the right to rely on the defendants being truthful. And if they haven't, the court can infer that they have undermined the plaintiff's right to a day in trial. And that is fraudulent concealment, whether it's intentional or unintentional for purposes of 1401. But can I also add your honor, one important point of evidence and a finding made by the judge in this particular case, and I'm going to cite the court to page C735, it's actually 735 in proceedings. Judge Reisinger said that Ms. Patel chose not to disclose the information to Judge Corey. This isn't just, you know, all of this. I'm sorry, go ahead, your honor. Well, but counsel, he made some other remarks as well, certainly derogatory towards her with respect to her being stupid was the word he used. So I'm not sure his finding was as clear as you make it out to be. But we also have Judge Airelli's determination that defendants and their counsel did not commit an intentional discovery violation. So I'm not following with regard to Judge Airelli's where you're going with this. So a couple of things, your honors, and I could refer the court back to page 736, where Judge Reisinger did say, and he did use the word either being stupid, but he said, or they were intentionally deceptive. So he did make that comment. Judge Airelli was examining a sanctions motion, and whether or not they're sanctions and looking at the evidence presented in the four corners. But let me get back to here. It's not just the 1401 page Pominic report. There's more. They didn't disclose a witness until we were in the 1401 proceedings, Diane Harney. They've never disclosed that. And quite frankly, once the Pominic report, the full three pages was discovered, and when the OSF was outed, so to speak, Mr. LaFontaine had to go back and analyze and figure this out for himself. Neither OSF or their attorneys ever called him up and said, we're sorry, you know, this same report existed in the Fredman case. We didn't disclose it. He had to figure this out. And so I think, you know, whether or not the court said it, I think the record supports a finding there was intentional concealment, even though I don't believe that's the standard we have to rise to. The record does support this court finding that. Because again, it wasn't just, you know, I did not, this narrative that there's some new technology they didn't understand doesn't hold up in the face of the other concealments and deceptions and failures to disclose with discovery. They didn't answer the discovery. They didn't seasonably supplement it as they were bound to. They were not candid with the court at the motion to compel hearing. When they knew, when the two defense attorneys testified, they each testified, they knew they had this information. Also, let us not forget that Tim Miller of OSF signed the discovery. This was his job to certify what discovery the defense attorneys were producing. And when they brought it back to him to certify, giving over this one page report, he certified that as being true and correct. He looked over the, I mean, we must, we must conclude that he reviewed his answers before he signed them. And there was nothing mentioning other witnesses. Diane Harney was never mentioned until the 1401 proceeding. There was no mention of any witnesses involved in this investigation of the incident, their conclusions. There's no delineation that there was no disclosure. There's data. He affirmed this and the trial court in its actual ruling on granting the 401, you know, a lot has been said about the defense attorneys, but I could refer the court to page 541 and he faulted OSF, the defendant. They're the ones that gave the data to the defense attorneys. OSF is the one that certified the data. OSF is the one that allowed this fraud and deception to be perpetrated on the plaintiff. How would this case have been litigated differently? Had plaintiffs known the, the existence of the additional permanent data? Okay. Thank you for asking that your honor, because Mr. Lafonte testified in detail to that effect. And I I'd like to go through that and I'd like to preface it with just giving the court a framework that, you know, this report is not just something plaintiff jumped onto to try to get a second day in court because as the testimony and evidence shows what was in this report that came out in the Simmons case was a narrative description of the incident, initial event classification and severity level, the injuries, the most significant actions taken, the injury details, the reporter's recommendations, the event witnesses, a case summary, follow-up comments, actions and referrals and a follow-up status. You're referring to Simmons? That's, that's, we got from the three-page report from that. In, in this case, I'm sorry, you mentioned, I thought I heard you say Simmons. Yes, well this, remember the Simmons is, is the PMINIC form that is filled out and it had the detail relative to the Simmons case. Here, that form was truncated and did not have all that detail and through discovery we found out this form, just like in Simmons, we would have received this information and we could have explored it. We could have addressed the Medical Studies Act if it was ever properly raised, but even if there was any ruling, if we even knew the content of what was involved in this incident report, it was non-privileged means. Ms. Dodds, the items that you're talking about from the Simmons PMINIC data, they're categories of information, it's not actual information. Whether or not there was actually information attached to each of those categories that had been inputted or if the information had been inputted for those categories, whether or not there would have been something that was inculpatory or something that just didn't matter one bit, right? And that's for Simmons and in Fredman, who knows what's there, right? Well, as far as the responses, that's correct, but even those categories, that was not, we didn't have that information, that even those impact in this 214.01 analysis. Well, it, okay, I can answer it best by Mr. LaFonte's testimony as to how it impacted him as the trial lawyer and his testimony, first of all, it starts at pages 411 in the reports of proceedings, but as a footnote on page 10 in the reports of proceedings, he did advise the court definitively, well, I can't say definitively, to quote him. He said he probably would not have voluntarily dismissed this case had he had this information. So that answers a question the defense actually raised. But with respect to his testimony on how the information contained in this report would have possibly changed everything, it's for him, it brought up a lot of other forum questions that he thought went to the heart of the case. For example, questions as what could have been done to prevent this critical incident? Kay Daniels would have been identified, and what were her recommendations for prevention? She was like, she showed up in the Simmons report, and then we would find out that she's also in the Fredman report. Mr. LaFonte testified if he had this information, he would have prosecuted the case differently. He would have had more information available. He would have shared this information, the substantive information with the experts. He would have cross-examined witnesses differently. Aside from the report, he doesn't know what was in that data. It could have been fully supportive of the defense theory of the case. It could have said that there was nothing that could have been done to prevent this from happening. We just know, but Mr. LaFonte was assuming things that he didn't know, and was assuming that it was going to be beneficial to the plaintiff's case. How can we assume that here in this case? Your Honor, you don't have to assume that, because our burden in the 1401 is not to prove we would win the case below. To your point, once this data is produced, assuming we go back, we have an orderly Medical Studies Act hearing, we brief it, the court reviews the information, and it can go against us. That may affect the ultimate outcome, but if it goes in our direction, it's a whole new day as far as preparing witnesses. Again, our burden on a 1401 is not to prove that with this information we will win. What we have to show is that with this information, and this is what we've shown, it's kind of unique because a lot of the 1401s arise from an adverse judgment to the plaintiff or the defendant, whoever the movement is, and this was a voluntary dismissal. But it was predicated on being deprived of a whole line of discovery. My client has the right to discover the truth and the facts. Now, if we go back downstairs, ultimately we might not prevail, but the 1401, our Supreme Court has said, that's not what this is all about. And when there has been withholding of discovery, whether it's intentional or unintentional, and I could cite the court to, Your Honor recited to the Herrera decision, but if I could direct the court to, I think it's the, oh, the Buehler case. In a discovery context, the court said, half-truths are the equivalent to outright lies. They have the effect of affirmative concealment, and they inevitably mislead the opponent. The courts are not going to countenance this, and no party, as a general rule in the law, a universal rule in the law, can profit from their own misconduct. So here we have OSF, who failed to produce the report, the database, delineate the privilege logs, identify material witnesses, are now seeking to say it didn't matter. They can't say that. Going back to the Ostendorp case, in Ostendorp, there was a 214-01 petition filed because plaintiff discovered defendant gave false answers to interrogatories and withheld test reports and other information showing that the defendant was aware that the design of the gas tank and cap posed a safety hazard. So plaintiff discovered very specific information that would have been very pertinent to a plaintiff's case. Here, you're saying there was information out there. We're really not sure what it is, but it would have made a difference, and I don't see how Ostendorp supports plaintiff's case here in terms of it making a difference. Okay. The difference, again, that I submit under the analysis of these decisions, we don't have to show, and the case law is clear, we don't have to show we would have won below, but we have produced evidence that the concealment of this evidence, had it not happened, and it's not just the report, but there's nothing protecting their concealment of Diane Harney and finding out her information. We presented evidence from Mr. LaFonte that it affected his entire presentation of the case. Before you give the information to your experts and take their depths based on all the fact information you have, plaintiff didn't have all the facts. Ms. Harney was part and parcel of this incident investigation. We're entitled to find out what she knows. My client, I submit, is entitled to know what's in this report. It's not protected by the Medical Studies Act, we submit, but we haven't had that hearing. So, fundamental, this case is unique. Fundamental fairness warrants sending this back downstairs because of the we can sort this out in an orderly fashion to effectuate the fair administration of justice, which is what a 1401 is designed to enable. Thank you, counsel. Thank you very much for your attention. I appreciate it. Ms. Jansen, you have the opportunity for rebuttal. Thank you. So, I guess I want to start with a point that counsel made a number of times in talking about the court can infer from the non-disclosure that there was an intent. The court can infer that was on a motion on the pleadings. In that context, on a 2-615 motion, the court is required to draw inferences supported by the pleadings in favor of the plaintiff. That's not the case here. This is not on the pleadings anymore. This is on the evidentiary hearing. And whatever the court can infer from the evidence presented, Judge Reisinger did not infer, did not make a finding that all this evidence demonstrated intentional concealment by either Ms. Patel or Ms. Ferrer or Pat. I know counsel references the, as Judge Sienoff acknowledged, somewhat derogatory language with regard to Ms. Patton at page 735 in the record. Just point out that that was at an October 31st hearing, 10 days after the judgment granting the 1401 petition was already entered, the actual after ruling on the 1401 petition. That wasn't a finding that the judge made with respect to the 1401 petition. And again, the comments aren't as clear-cut a finding as counsel would like to believe. It's either this or that, didn't decide. In talking about the motion, the original motion to compel hearing in front of Judge Corey and what Ms. Patel did or didn't say, I will point out that it's quite clear that there was a portion of that proceeding that occurred in chambers without a court reporter. So we don't actually know what was discussed in chambers after the court reporter was gone. We do know that after that hearing was concluded, no order was entered with respect to the motion to compel. So we can't really use that as any evidence of any intent on Ms. Patton's part. Counsel pointed out that there's never been a ruling that the Medical Studies Act applies, and this court does have Judge Iorulli's findings, but with respect to prior to the entry of the 1401, that there was no finding, that was plaintiff's choice. Plaintiff had every opportunity to obtain a finding, but this was not protected. They chose not to, and Mr. LaFontaine made abundantly clear it was because the priority here was the pursuit of sanctions. As for the comparison with the Simmons form, counsel is making an assumption that all of the fields included on the Simmons form that's in the record or the Simmons output, that all of the complete data that was produced to Judge Risinger in camera and can see for itself that it's not the same. The Simmons data that had been withheld because it was required under the Medical Studies Act, Mr. LaFontaine conceded that that data was favorable to the defense. They weren't concealing data that would have hurt them. They were concealing data that it was favorable to the defense, but under the Medical Studies Act, they were not allowed to produce it. Unfortunately, mistakes happen, and it did get revealed at the Simmons trial. Counsel says that relies on the testimony from Mr. LaFontaine that he probably would not have received this information. Well, one probably is a pretty big word in that statement. Also important is the name LaFontaine. Mr. LaFontaine is not the plaintiff in this case. He was the plaintiff's counsel. While I have no doubt that Joseph Fredman placed great weight on the recommendations that Mr. LaFontaine provided, the choice about whether to voluntarily dismiss or not was his and his alone, and we have no evidence as to his reasons or what he would have done differently. I see my time is up. If the court has any further questions? I see none. Thank you, counsel. We appreciate your arguments. The court will take this matter under advisement. The court stands in recess.